LARS A. GARRISON AND GAYLE GARRISON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Garrison v. Commissioner
Docket No. 21594-84.
United States Tax Court
T.C. Memo 1986-261; 1986 Tax Ct. Memo LEXIS 347; 51 T.C.M. (CCH) 1273; T.C.M. (RIA) 86261; June 25, 1986. *347 Alan L. Schiff, for the petitioners. Robert J. Percy, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in income tax in the amount of $137,099 for the calendar year 1980. The only issue for decision is the value of certain real estate in the Village of Scarsdale, which petitioners donated to the village. For convenience, our findings of fact and opinion are combined. Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners were residents of Connecticut at the time they filed their petition. Petitioners owned two contiguous parcels of land bordering on the Hutchinson River in the Village of Scarsdale. These parcels will be referred to hereinafter as the "Village Property" and the "Netter Property." The Village Property was acquired by petitioners at an auction sale held by the Village of Scarsdale on November 18, 1975. Only abutting property owners or those with legal access to the property were eligible to bid. Petitioners were the highest bidders and paid $6,500 for *348 the Village Property. The next highest bid was $6,000 and an abutting neighbor, Carmine Labriola, bid $2,200. The deed from the Village to petitioners contained certain restrictions as follows: "No building may be constructed which may be usable for human habitation, nor may any tennis courts, or swimming pools be constructed, nor may any fence be constructed on the premises." Petitioners acquired the Netter Property in 1977 from the executors of the Estate of Robert and Francis Netter upon the payment to the estate of $1,000 plus the payment of back taxes due on the property in the amount of $3,686.31 for a total of $4,686.31. There were no restrictions in the deed for the Netter Property. The Netter estate originally offered the property to petitioners in 1976 for $5,000 plus the payment of delinquent taxes. In 1964, the estate had offered the property to the Village for $5,000. The area in question was zoned to permit residential lots, with 50 by 100 feet being the minimum lot size permitted. The property has been zoned for residential development since approximately 1888. The Village and Netter Properties, adjacent to the Hutchinson River, are low and swampy. Most *349 of the subject property is within a wetland area and a flood plain, therefore, development is subject to approval from various local, state and federal agencies. A portion of the Netter property is within a floodway where development is absolutely prohibited. In 1979, petitioner attempted to make a gift of both properties to the Village of Scarsdale. This gift was rejected by the trustees of the village, because the village was attempting to get rid of, rather than acquire, various small parcels of land around the village which resulted in maintenance problems and complaints from the citizens about dumping and other illegal and improper uses of the properties. This rejection of petitioners' offer of a gift resulted in a public outcry led by the Scarsdale Audubon Society, the League of Women Voters and other groups who viewed this property as a natural preserve which should be acquired and kept in its natural state by the village. Yielding to this constituent pressure, the trustees in 1980 voted to accept the Village and Netter properties from petitioners with the understanding that a fund would be set up to maintain the property. Petitioners contributed $5,000 to that fund. *350 The deed from petitioners to the Village of Scarsdale contained the "express condition that the property shall be maintained in its natural state, free of all buildings and structures, with the right of reasonable public access thereto, and subject to the natural and uninterrupted flow of the brook crossing the premises." Petitioners on their income tax return for the year 1980, took a deduction for $290,750 for the value of the land contributed and a deduction for $5,000 for the gift to the maintenance fund. Respondent allowed the $5,000 cash gift to the maintenance fund but determined that the property was worth only $17,000 and allowed only that amount as a deduction. Petitioner on brief lowered their claimed deduction to $231,030. Petitioners called as witnesses a real estate appraiser, an engineer, and a developer for the purpose of substantiating their values. The real estate appraiser, Mr. Marx, originally valued the two properties at $511,500 based upon a plan which subdivided the properties into thirteen lots. Subtracting the engineering costs of $220,750 to bring the properties to grade, the value reached was $290,750, the amount petitioners claimed on their return. *351 Mr. Marx subsequently revised his appraisal by excluding the Village Property from the subdivision because of the deed restriction imposed by the village. In the revised appraisal the Netter Property was subdivided into six lots with the Village Property providing incremental value to the abutting property owners. He assumed that the requirements of various governmental regulations would be met and that approvals would be received without too much difficulty from the zoning board, the planning board, and several environmental agencies. Following the approvals, the property could be brought to grade. Based upon the selling price for building lots in the area which were scarce since the area had been already well developed, he came to a total value for this property of $333,030 subject to the engineering costs. Petitioners' engineer, Mr. McCurdy, testified that the Netter Property could be brought to grade and otherwise dealt with from an engineering point of view to make the lots buildable. His testimony with respect to the environmental impact and the possibility of receiving the necessary approvals from the environmental agencies was rather vague and indefinite and at one point *352 in his testimony, he denied having any environmental expertise. Mr. McCurdy concluded that development costs would run to $102,000 for the Netter Property, which included road construction, grading, and engineering. It is not clear whether he took into account any of the other costs of development such as sales commissions, filing fees, planting, and the like. Finally, a real estate builder and developer, Mr. Silverstein, who had had many years of experience in developing residential property in the area, testified that development was possible and would be economically feasible. However, his conclusion was based upon the assumption that he was working with building lots which had received all of the necessary approvals. Respondent's expert, Mr. Jefferies, took the view that these properties were basically wetland and flood plain properties which could not be developed. His secondary position was that even if all necessary approvals could be obtained, development was not economically feasible, since the cost of filling and bringing the land to grade, putting in streets, and otherwise making building lots out of this low, swampy area would be prohibitive. Mr. Jefferies' basic *353 position was supported by other witnesses. Mr. Newman, the Deputy Village Manager, testified that the property falls into the wetlands and flood plain area which would require applications to local and state environmental agencies and approvals before any development could be accomplished. He did not presume to speak for those agencies and predict what their decision would be, however, he testified that he personally would not recommend approvals for development. He also testified that he would expect substantial objections from neighbors and other citizens' groups if applications were made. Although these complaints had no binding effect and might be ignored by the various boards involved, they would have to be taken into account as a practical matter, as they were in 1979 and 1980 when the board of Trustees initially attempted to turn down petitioners' gift of the property. Mr. Labriola, a retired landscape gardener and neighbor who has lived on property abutting the Village Properties since 1949, also testified. He attempted to buy the Village Property in 1976 at the time it was acquired by petitioners. He wanted to buy the property in order to have control of it and join *354 with his neighbors in cleaning it up and eliminating the use of the property as a dumping ground for leaves and other trash. He bid $2,200 for the Village Property as that is all that he was willing to pay for the property for his purposes. Having lived next to the property for over 30 years, he had concluded from his own experience and after discussion with the town engineers that it was too wet and swampy for building and did not consider the Village Property, or for that matter the Netter Property, as being suitable for development. Upon review of the entire record, we agree with respondent's position. These properties have been zoned for residential development since 1888. The Netter property was offered for sale in 1964 and again in 1976 for $5,000. The Village property was offered at public auction in 1975, and although there were only eleven abutting owners who were eligible to bid, in fact only three bid and $6,500 bought the property. The Village of Scarsdale is approximately 100 years old and there are very few empty building lots left in the village. Throughout this entire time, the subject property has never been built upon or developed. It seems logical to conclude *355 that if the Village and the Netter Properties had been suitable for development, this would have happened some time ago. After careful consideration of all of the expert witness reports and testimony with respect to the valuation of this property, it is our conclusion that petitioners have been far too aggressive in their claimed value of this property and in seeking to profit from their "good works" at the expense of Uncle Sam. The position of respondent is more logical and reasonable and accordingly, we find that the value of the Netter and Village Properties was $17,000. Decision will be entered for respondent.